Good morning and welcome to the Ninth Circuit. I hope everyone is doing well today. I'm Judge Michelle Friedland. Judge Bivey, Judge Miller, and I are very happy to be here in Alaska, and thank you all for coming this morning. We have several cases on calendar for argument, but one is submitted on the briefs. That is Hassan v. Municipality and City of Anchorage, 23-35466. That case is submitted, and we'll hear the other cases in the order in which they appear on the calendar. The first is United States v. Jones, 23-422. Each side will have 10 minutes. Good morning, Your Honor. Myra Sun, appearing for Mr. Jones. Mr. Jones presents two constitutional claims in attacking his convictions. The first is under the Fourth Amendment, in which he challenges the seizure of the evidence that was used to support his conviction. And the second, which the Court wouldn't have to reach if it did fine for him on the Fourth Amendment claims, is a claim under Bruin. However, I know that the Court issued an order asking us to address Duarte, the case that was decided on May 9th, which, in my view, is consistent with the claims we made in the Bruin section of our brief. But I want to go first to the second point that the Court asked us to address, which is the application of Rule 12 of the Federal Rules of Criminal Procedure to my client's Bruin claim. Rule 12 breaks up pretrial motions into basically three groups. There are motions that a defendant can make that he can make pretrial, but whatever claim or defense. There is the issue of jurisdiction, which can be raised at any time. And then there are motions that have to be made pretrial. And those are listed in Rule 12b-3. We think of our Bruin claim as falling under Roman numeral 5, which is a dismissal motion that would be based on the fact that Section 922g-1 is invalid constitutionally as to Mr. Jones, based on the Second Amendment and on Bruin. And this is one of the claims that he had to raise pretrial. And the rule goes on to say that only if a defendant has established good cause may a court, and it doesn't mean the district court, I think the phrase a court would include this court, if it found that Mr. Jones established good cause. In Duarte, the court thought that there was good cause because at the time he could have filed such a motion, Circuit President and Vangie would have foreclosed the claim. But in the Duarte court's view, that was abrogated by Bruin. Your situation is different though, because Mr. Jones' trial didn't happen until after Bruin, right? Right. And this causes me to go back to the predicates for the requirement that a certain motion be filed pretrial. In 2014, when the committee amended Rule 12, it added this clause. Certain claims have to be raised, quote, by pretrial motion if the basis for the motion is then reasonably available, end quote. That wasn't in the rule before. And I went through the committee notes, and I do think a lot of times what they're talking about is evidence gathering, whether evidence to support a motion is available pretrial. But I believe that this clause also bears on whether my client could reasonably view himself as having a challenge to Section 922G1 under Bruin because of Vangie and because this court didn't address Bruin, even in the context of a similar statute, one of those handgun licensing regimes in which it was 18 days between the decision in Bruin and the start of my client's trial. And this may not matter to the court, but when you are preparing for trial, and this was Mr. Jones' second lawyer, when you are preparing for trial, probably you're not paying as much attention. I don't know if that makes it reasonable or unreasonable. As a trial lawyer, I would have thought it unreasonable to expect me to interrupt my trial preparation for that purpose, to make sure I filed a Bruin motion. But I think we would still rely on Vangie being the law of this circuit, and going to the reasonable. Suppose we accept that there was a good cause for not filing this. Why under Duarte do you think that you win? I agree with the Duarte court that the use of the word, the phrase, the people in the Second Amendment is to get wide application. And it's funny because the Bruin test is first the plain text and the plain meaning, and then we talk about historical analogs. And yet, whether there's a historical analog circles back to the people. And because state legislatures never permanently disarmed people convicted of felonies in the colonial era, and I don't think that's been disputed by the government. I think the best they can do is what they think of as a relevantly similar analog, not with respect to classes of people who are disarmed loyalists, people who are enslaved, people of not the religion that the Puritans were. What were his felonies, his prior felonies? My client's felonies were felony driving under the influence, classified as felonies because he had multiple misdemeanor convictions. And at some stage, the state felonizes, if you will, that crime. And why is that a violent felony? You could kill someone. He could. And, Your Honor, I think that, so I jumped to the part of Duarte that discusses what felonies were in the colonial era analogous to the crimes of my client. And the last category is violent felonies. And I looked it up this morning. Dangerous, which is the government argues that DUI is a dangerous crime because something, because bad things can happen. People can be killed and injured. But violent is a narrower definition. It has, it's equated with the use of force. And that's why in Leo College... Do you think the Duarte court required that it be violent? I mean, I know they, I mean, they use the word violent a bunch of times, but when they actually stated the holding, I thought they were stating it in terms of what would have been a disarming offense. Right. In the colonial era. When I looked at that a little bit and, you know, there was an act for the regulation of the militia in the Commonwealth of Pennsylvania that said if any non-commissioned officer or private shall on any occasion in parading the company to which he belongs be found drunk, he shall be disarmed. I mean, and I think New Jersey had a similar law that they obviously didn't have cars, so you couldn't, you couldn't drive drunk, but they understood that drinking and firearms are potentially dangerous. Why isn't that? Well, first of all, we have overlaid for what it's worth, this, the classification of offenses, and I want to reserve a minute for rebuttal, as violent for purposes of enhancing sentences under section 924. And the court knows that in Leo Colle versus Ashcroft, that the Supreme Court decided that a DUI conviction was not a violent offense, and that was in the immigration context, but it also would apply here. And I think they made the distinction between the use of force as defining a crime as violent versus the risk of danger. And that is the same distinction the dictionary definition makes. Again, I'd like to reserve a minute for rebuttal, if I could. I'd actually, can you stay for a minute? I'd like to ask a question about the merits issues before you go. So, I'd like to just ask about the bilge pump on the boat. Okay. So, is it your understanding that the district court made a fact finding that the operation of the bilge pump meant that someone was on the boat? I think what the court said is that the officers who testified about it were credible. But I think what they said was, I think one of them said, it depends on what kind of bilge pump it is. And later at trial, my client explained that his bilge pump was the kind that does, I believe, it was on, it has an automatic setting, and that it was on an automatic setting. What he testified was that a red light, which could be seen in one of the photographs that was the bilge pump, was on automatic. I do want to emphasize, though, that somebody being on board in this context doesn't mean probable cause to believe that the person you want to arrest is aboard. Well, if the person you want to arrest is the owner of the boat and you think someone is on the boat, isn't it pretty likely that it's the owner of the boat who's on the boat? You know, normally I'd say that, but that was not true in this case. I think that was a very important aspect of my client's... Well, was there any, it's objective, though. Is there any reason that an objective officer would not think that if someone is on the boat and there's an owner of the boat, that the person on the boat is likely the owner? Yes, because when, the information that the government had, or the troopers had when they went out to the boat was that three days before, the mayor had reported noting that the boat was tied up where it was tied up, and that Mr. Jones was on it. But he didn't say, he's on it right now, go get him, that, because that sounds more like what he said. He didn't say they would be... In general, if a boat has an owner and someone is on the boat, is there a high likelihood that it's the owner? Less in this case because the mayor, or excuse me, the surveillance that was done, very brief surveillance by one of the troopers, did not identify Mr. Jones as on the boat at that time. Did they know who, did they know who Jones was at that time? Did they know who, did they know that it wasn't Jones? They didn't know if it was, and they didn't know if it was... They just thought he's on the boat, right? And then a couple of guys got off and got on the skiff. Right. That morning, somebody came aboard, came ashore, excuse me, in one of the smaller things that had been tied up, a skiff that had been tied to the boat. I think my point is that the mayor watched the boat and didn't see Mr. Jones. And I think that verification of the likelihood, or some verification of the likelihood, that he will be on board when you go to execute the arrest warrant is necessary. But there's no dispute that the mayor knew who Jones was. The mayor's... Yes. I don't think there's... And the mayor said, Jones has been on the boat. So we know that within the three-day period that Jones is at least in the area, but he's not... Right. He's not renting the boat off to somebody else on an area. And I'm just saying that comparing it to other cases where the agents had surveilled much longer, knew the movements of the person in much more detail, that it's really a matter of the quantum of evidence that they had that he would be on the boat, that he might be on the boat at the time they went out there. And all of the officers conceded that they didn't know that. And once again, just because somebody, especially since other people have been seen on the boat in those last few days, is not probable cause in our view to say that he was... Probable cause isn't more than 50%, right? So... No, no. Right. Right. It's a totality of the circumstances test. But in this case, there are too many things to suggest that they didn't have a reason to believe he would be on the boat at that time. Because what they did, and I just... What they did was go... The equivalent of going, we say to a house, and if you say it's a car, a big car, okay. They go out there and then they... Basically, if it was a car, you'd say they sort of saw that it was unlocked and opened it. I mean, even if one has reasonable suspicion to believe that a person may be in this vehicle and you can't see Mr. Jones in it. Are they allowed to open the car to see... To search it? They aren't. To go in and check and see what's in there? They aren't. If they have reasonable suspicion to detain a vehicle, an empty vehicle that belongs to him, for all they know, and it's empty, then they can watch it. And when he arrives or if he shows himself, they can execute their arrest warrant. But what they did was not, in our view, consistent with either the detention of the vehicle or the... Or surveillance of the building. Okay. I think I should cut you off, but we'll give you two minutes for rebuttal. Let's hear from the government. Morning, Your Honor. May it please the court, Stephen Corso for the United States. The defendant, Mr. Jones, waived his constitutional argument here. He had no good cause for failing to challenge the sufficiency of the indictment on grounds that 922 G1 is unconstitutional as applied to him. Under the rules, he had to bring his Second Amendment, and he had no sufficiency of the indictment to charge an offense, and it must be brought below. The defendant has no good cause for failing to raise this claim. I mean, if Bruin had been decided that morning, would he have had to raise the objection? It's a more difficult situation, and there was discretion involved, obviously. But in this case, Bruin was issued two and a half weeks before trial started, and maybe, more importantly, eight and a half months before sentencing. So he had ample opportunity to raise the constitutional claim while his case was pending in the district court. He did not do so, and the parties agree on that. How much would he have had to have said in order to preserve the argument? Could he have said, I'm preparing for trial. Here's a one-page. The court has issued Bruin. I believe that I have a non-frivolous argument under Bruin that this law is unconstitutional as applied to me. I will need further time to develop it before trial, but because I'm getting ready to do it. It seems he would have to raise the claim. So I think if he did do a short one-page, citing Bruin, citing the potential of an argument to attack the Second Amendment, or citing the Second Amendment as a reason to attack the felon in possession charge in this indictment, would have been sufficient to at least make the claim, and like Your Honor says, come back to the claim in more detail in the future. On the merits, what do you understand the holding of Dorte to be with respect to the question of, do we look at what he actually did when he drove drunk? Or, I mean, we've all enjoyed the modified categorical approach under ACCA. Do we apply something like that here? I think the holding complicates the government's position in Jones. The holding in Dorte suggests that many applications of 922-G1 are unconstitutional, including the application here. We believe, though, that there's a slight distinction between Mr. Jones' case and Dorte, and that involves the standard that the court in Dorte applied, which was a distinction. It's a distinctly similar standard to the historical analog. We suggest that the court look at applying the relevantly similar standard to a historical analog. We recognize it's hard for us to come up with a one-to-one comparison between a felon in possession based on prior DUIs and a historical analog. We've looked. We can't find one. We'll keep looking, but we haven't found one yet. Do you think you need to do that? I would have thought your position would be that there is a federal statute that on its face applies to him, and he's making the argument that we should invalidate an act of Congress as applied, and normally statutes are presumed constitutional. Shouldn't it be his burden to demonstrate that it's not constitutional here? I think on the Bruin test, the burden shifts to the government to establish a historical analog, and the question then becomes under what standard do you view the government's burden to establish that analog? Conceding here slightly that it's difficult for us to find a historical analog to DUI back at the founding, we urge the court to shift its attention to the dangerousness of the felony and take a broader, more expansive approach. In evaluating the DUI and the analog to the founding era. How is that consistent with what Duarte says? It's inconsistent with what Duarte says because Duarte, in that case, applied the distinctly similar standard, and we're urging the relevantly similar standard. But we can't, I mean, I understand you have a pending petition for re-hearing on Bonk, which either will or will not be granted in Duarte. If it is, I suppose that moots this discussion we're now having, but if it isn't, we can't depart from what Duarte said, can we? No. Duarte is the law of the circuit unless it's dealt with on Bonk. And so to be clear, it is your view that, setting aside the waiver point and the Rule 12 issue, but if we think the claim is properly before us, if Duarte provides the rule of decision, you lose? It makes it harder for us. It's not an automatic loss, but it makes our burden, it makes our effort a little more complicated. So what is your effort? The effort is that the court should look at the dangerousness of DUI and apply a relevantly similar standard. Duarte suggests to us that the court demands a one-to-one comparison, and we're urging the court to take a broader view and look for something more than just a one-to-one comparison. But that sounds like you're asking for a departure from Duarte. We're asking for a distinction from Duarte. And what would be the basis for making that distinction? That DUI is a modern crime, unimaginable at the founding era, which is consistent with the language in Bruin, and Duarte itself recognized that point as well. So it sounds like Judge Miller found some old statutes about drunkenness. Have you looked at that? I mean, is this an issue where you would need supplemental briefing, or do you think you've already done everything you can do? We would appreciate the opportunity for supplemental briefing. We've obviously not had the opportunity to brief the case post-Duarte, so we would ask for, respectfully, and volunteer to submit a supplemental brief a few weeks in time. But historically speaking, there are statutes that we would cite the court to. In the United States v. Perez-Garcia, that case did a historical analysis involving the pretrial release condition forbidding firearm possession. It came up with 17th century English law, the English Bill of Rights, which allowed disarming irresponsible people, unrecognized that that coexisted with the precursor to the Second Amendment, which is the right to keep and bear arms under English law. The Militia Act of 1662 disarmed people judged to be dangerous to the peace of the kingdom. In the American colonies, there were laws that disarmed loyalists to the British crown. Justification was there that they were a danger to the colonies and a danger to the revolutionary war effort. Other early American laws, 1736 Virginia, could disarm individuals deemed dangerous or unlikely to follow the sovereign's law. Precursors to the Second Amendment, John Adams argued that Congress may not prevent the people of the United States who are peaceable citizens. Again, denoting danger from keeping their own arms. The Anti-Federalists in Pennsylvania cited the right to bear arms unless for crimes committed or real danger of public injury from individuals. If we step outside the distinctly similar one-to-one comparison in Duarte and look at the issue more expansively, there are historical analogs based on danger. Of course, we submit that DUI is a very dangerous crime. The Supreme Court has recognized that DUI is an extremely dangerous crime. Its imminence of danger posed by drunk drivers exceeds that in other types of crimes. There are statistics, of course, every year thousands of people die in alcohol-related car crashes. Driving under the influence is a danger to people going about their ordinary business. Everybody on the roads are, of course, at risk from a drunk driver. I don't know if my colleagues have more questions about this, but I'd like to ask about the bilge pump. So what is your understanding of what the district court held or found as a matter of fact about the bilge pump? Similar to my friend on the other side. The court credited the testimony of the state troopers in connection with the bilge pump. Their observation, their testimony was, of course, that the bilge pump was an indicator, one of several, that the defendant was on the boat at the time they approached the boat. And do you think that fact-finding is just the bilge pump was on, or do you think there's something further, that the court made an inference from that that's a fact-finding that we review for clear error, that the fact that it was on means there was someone on the boat?  And there's this debate between manual and automatic. I think the court should recognize this is in southeast Alaska on the island of Kloak. People that live on those islands, boating is a big part of life in that area, and the troopers and officers are familiar with boating, and they understand boats, how they're used, how they're maintained, and how they work. And so for the officers to see the bilge pump on, it was a sign to them that somebody was on board and that somebody had been on board in order to trigger the bilge pump. And because it was running, somebody was on the boat. In fact, I think the pump continued to run even after the arrest, indicating to the officers or confirming that someone on the boat had actually turned it on and overridden. Is there any case that says, essentially, like if someone is renting an apartment and you see the windows, there's someone, a shadow behind the window shades, you know someone's in the apartment, that you can assume it's the person who lives there? I don't have a case, but I think that makes a lot of sense, and I think courts would credit that evidence under a totality of circumstances review. Because that's essentially what you're relying on here, right? He owns the boat. He was on it at some point. He owns the boat, and someone's on the boat. And so that's really what we get to get him to be likely on the boat. That's part of it. But the other factors are that they had received a tip from the mayor that he was in town, that he had come in town, that he was on the boat, and the officers had done some surveillance on the boat and had seen men go to and from the boat, and there was somebody on the boat to greet the men who came to the boat. Basically, we have three days ago he was on the boat, he owns the boat, and someone's on the boat. I don't think there's more than that, really, right? The fact that people were coming and going, that doesn't tell us whether he's still on the boat beyond the idea that he was on the boat at some point. It's his boat, and someone's on the boat. We think it does. We disagree there. We think that somebody on the boat greeting the people who came to the boat is further circumstantial evidence that the owner of the boat was on the boat. But the key here is, was he on the boat at the time the officer was approached? And earlier that day they had seen the skiff go to the boat and come back, and at the time they approached the boat there was a jet ski tied to the boat. They circled the boat as it was anchored in the harbor. They got on the boat. They saw that the cabin door was ajar, again, another sign that somebody was on the boat. And, of course, the defendant was, in fact, on the boat. Thank you. Let's hear rebuttal. Thank you very much. Thank you very much. The last about the bilge pump, Your Honor. If it was on automatic, that meant it was going to turn off and stop pumping water out of the boat by itself. And I think the purpose of an automatic setting is that you don't then have to worry about turning it on or turning it off.  But that's, I think, as I understand it, you're arguing against the inference that it seems like the district judge made. I mean, it seems like the district judge thought the fact that the pump was on meant that someone was on the boat. And I think we review that for clear error. So are you arguing that it was clearly erroneous? I think so because, well, it says somebody's on the boat. But, again, to execute an arrest warrant you've got to have probable cause to believe that the person you want to arrest is on the boat. It's a different argument than whether the pump being on says that someone's on the boat. Right. Can you argue that it was clear error to say that the fact that the pump was on means someone was on the boat? Is that what you're saying? I am, although, again, my client testified, and that could conceivably have changed the finding. I recognize he didn't do that until trial. But I'd ask the court to consider the whole record here. Is somebody observing this from the outside? So is the bilge pump on the outside of the boat? It's on the deck. We would say, and I don't know if this is in the record or not, that where the officers were as they circled it would not have allowed them to see exactly what the bilge pump, everything about the bilge pump, including whether the switch would have shown that it was. How big is this bilge pump? I'm only going by the pictures, and my friend can help me. But I think about a couple feet across. I don't know. Okay. All right. And could the officers have told from the outside whether it had an automatic setting? That I don't know. I can say that the record would show, based on my client's testimony, that there's a red switch on that could be seen in one of the photographs. But that was when they got on the boat. That was once they got on. They couldn't see that. The only thing they could see from outside was that it was pumping, right? Right. Right. On going back to the Duarte issue, I didn't get to say what I think, which is that what the Duarte court was trying to do was define what we mean by the kind of crime that in the colonial era would have called for disarming. And I first want to say that disarming, for example, loyalists, they could get their guns back, okay? This statute, 922G1, permanently disarms a person. That means he can never have a gun in his home for self-defense, as the Second Amendment would normally permit him to do. And I think that that's got to be relevantly similar. And so the militiaman who loses his arms, it's not clear to me that that law meant he could never get his guns back. And I think that that's something that bears emphasis. But relevant similarity in this case, I agree. It doesn't have to be a perfect historical analog. But the Duarte court tried to narrow it to those crimes that we knew were nominally capital in the colonial era, burglary, homicide, murder, certain violent crimes that I think pretty closely track our modern-day definition of a violent offense. But the last thing I want to leave the court with is we know that there are many, many, many more federal felonies now than there were in the colonial era. And permanently disarming people for having felony convictions based on some amorphous idea that they are dangerous, I think is going too far, and it isn't consistent with what the historical tradition of this country is. Thank you. We've taken you over your time. Thank you, both sides, for the helpful arguments. This case is submitted.
judges: BYBEE, FRIEDLAND, MILLER